■ In the Matter of HUDSON VALLEY NURSING CENTER, Respondent, v DAVID AXELROD, as Commissioner of the New York State Department of Health, et al., Appellants.—Yesawich, Jr., J. Appeal from a judgment of the Supreme Court at Special Term (Hughes, J.), entered March 13, 1986 in Albany County, which granted petitioner's application, in a proceeding pursuant to CPLR article 78, to annul a determination of the Department of Health denying petitioner's request for a redetermination of its Medicaid reimbursement rate for the years 1982 and 1983.

Petitioner, a participant in the Medicaid program, is a provider of residential health care services for the elderly; it is owned and operated by Stanley and Judith Dicker. The Department of Health is charged with determining petitioner's Medicaid reimbursement rates pursuant to Public Health Law § 2807. Rates are computed on the basis of actual costs incurred in the base year, which is prior to the reimbursement year. These costs are then increased by a trend factor which takes into account inflation and a capital cost component which, as in the case of a proprietary facility such as petitioner, includes a return on equity. The sum of these figures constitutes the facility's prospective rate.

The controversy herein centers, in part, upon the Department's treatment of a mortgage loan made to Highland Associates (Highland) by Prudential Savings Bank (Prudential) in 1972. At the time of petitioner's rate appeals, the mortgage principal exceeded $1,950,000, on which the annual interest rate was 7%. In 1972, proprietorship of Highland, a partnership which owned all of petitioner's fixed assets, was equally divided between the Dickers and Prustan Corporation (Prustan); the latter was then a wholly owned subsidiary of the mortgagee, Prudential.

Emigrant Savings Bank (Emigrant) merged with Prudential in March 1979. As a consequence, Emigrant became the sole shareholder of Prustan, and owner of 50% of Highland—and the joint venture the Dickers and Prustan had embarked upon —and, therefore, one half of the fixed assets of petitioner.

In calculating petitioner's Medicaid reimbursement rate for 1982 and 1983, the Department, as it had in the past, considered petitioner's interest payments to Emigrant an "allowable cost" in computing petitioner's base year costs. Pointing to the direct relationship between petitioner and Emigrant, petitioner argued they were "related" parties for Medicaid reimbursement purposes and inasmuch as the Department's regulations provide that allowable costs shall not include interest paid to a lender related to the borrower, the mortgage should have been characterized as equity and petitioner's reimbursement rates should have included an equity return thereon instead of the 7% interest rate it paid. For the years 1982 and 1983, the equity rates of return were 16.5% and 20%, respectively.

Additionally, petitioner sought review of the Department's partial exclusion of certain administrative salaries paid to two groups of employees. This was done pursuant to two separate regulations which placed ceilings on salaries paid to "administrators", here, the Dickers and two others, and "relatives of administrators", Nat Shapins, petitioner's purchasing agent and a relative of the Dickers. Petitioner seeks inclusion of these amounts in its allowable costs.

Administrative appeals designed to achieve revision of petitioner's reimbursement rates for the years affected were unsuccessful, prompting petitioner to commence the instant CPLR article 78 proceeding. Special Term, granting the petition in its entirety, directed respondents to recompute petitioner's 1982 and 1983 reimbursement rates, so as to reflect the amount of the Emigrant loan as equity capital, and to also

reflect petitioner's actual costs for the salaries of its administrators and purchasing agent.

Addressing the mortgage issue first, we note the regulation in issue provides that "[a]llowable costs *shall not* include the interest paid to a lender related through control, ownership, affiliation or personal relationship to the borrower, *except* in instances where the prior approval of the Commissioner of Health has been obtained" (10 NYCRR 86-2.17 *[l]* [emphasis supplied]; *see also,* 10 NYCRR 86-2.20 [b]). Where the parties to the transaction are so related, the amount of the loan is considered a contribution to the borrower's capital (part of the borrower's equity capital) and in the instance of a proprietary facility, is reimbursed through an annual equity return established by respondent Commissioner of Health (10 NYCRR 86-2.21 [a] [4]; [e] [6]; 86-2.20 [b]).

It is conceded that the parties to the loan are "related" and that petitioner has not sought "prior approval" of the Commissioner to have the interest on the mortgage treated as an allowable cost. Thus, application of this regulation hinges upon respondents' innovative assertion that they may unilaterally invoke the exception provided in 10 NYCRR 86-2.17 *(l)*. This court has recently stated that: "While it is true that great deference is to be given to the Commissioner's interpretation of a regulation *(see, Matter of Cortlandt Nursing Care Center v Whalen,* 46 NY2d 979), it is also axiomatic that an agency is bound by the language of its own regulation and cannot construe it in such a manner that the plain language on the face of the regulation is rendered meaningless *(see, Matter of Nekoosa Papers v Chu,* 115 AD2d 821, 823; 2 Davis, Administrative Law § 7:21, at 98 [2d ed]). A regulation should be construed in its natural and most obvious sense without resorting to a subtle or forced construction *(Matter of Cortland-Clinton, Inc. v New York State Dept. of Health,* 59 AD2d 228, 231)." *(Matter of Grace Plaza v Axelrod,* 121 AD2d 799, 801.) Significantly, respondents fail to cite to any other case or authority giving 10 NYCRR 86-2.17 *(l)* the construction they have advanced. The language of this regulation is quite clear; interest paid to a related entity is to be excluded from allowable costs unless prior approval has been obtained from the Commissioner. That approval power invests the Commissioner with jurisdiction to entertain requests importuning him to grant an exception. By some alchemy, respondents draw from this capacity to receive exception requests the right of the Commissioner to make them. Such a construction leaves the language meaningless, since it enables the Commissioner to

apply the exception, at any time, without any basis. Had the Commissioner intended to reserve authority of this nature unto himself when the regulation was promulgated, most assuredly it would have been drafted accordingly.

Nor are we persuaded by respondents' contention that because departmental rate setters acting on respondents' behalf have consistently given this regulation a practical application and have allowed the 7% interest item as an operating expense since 1972, that this long-standing interpretation of the regulation, however perverse, is nevertheless controlling and should continue undisturbed "in the absence of weighty reasons" (Matter of Sigety v Ingraham, 29 NY2d 110, 114). The essence of this argument is that respondents have regularly construed these provisions to deny petitioner treatment of the loan as equity and, therefore, that interpretation should control this appeal.*

Respondents' reliance on Sigety to support this contention is misplaced. Sigety dealt with the Commissioner's uniform interpretation of a regulation as it applied to all similarly situated parties (supra, at 115). By contrast here, the record indicates that this regulation has not been uniformly applied to all similarly situated parties. Indeed, it appears the Department, through its Bureau of Audit Appeals, considered an appeal sharing obvious affinities with petitioner's appeals and required equity treatment of a related party loan pursuant to these regulations. Although it may have been the Department's undeviating practice to erroneously administer these regulations insofar as they applied to petitioner, that fact without more does not preclude petitioner from securing relief from that practice.

Respondents' final argument is that the Department's treatment of the loan is justified for the loan meets the conditions of the Medicare Provider Reimbursement Manual (HIM-15) § 1010, a Federal Medicare provision. There is no need to confront the merits of this claim. 10 NYCRR 86-2.17 (a), to the extent pertinent, provides that allowable costs for Medicaid reimbursement rates are to be determined by application of Medicare reimbursement principles "[e]xcept as otherwise provided in this Subpart". Inasmuch as the department's

---

* Respondents assert that from 1972 to 1981 petitioner did not object to its treatment of these payments as an "allowable cost" and that petitioner's efforts are merely an attempt to recoup a windfall. At oral argument, petitioner handed up a stipulation signed by the parties indicating that this issue has been a continuing source of litigation between the parties in many rate appeals pending with the Department.

regulations do "otherwise provide" *(see,* 10 NYCRR 86-2.17 *[l];* 86-2.20 [b]; 86-2.21 [e] [6]), the suggestion that a Federal Medicare provision applies, and, if not, it nonetheless somehow lends force to respondents' argument, is simply implausible. In view of the foregoing, the judgment, to the extent it exemplifies Special Term's determination annulling the treatment of the Emigrant loan and directs that respondents recompute petitioner's Medicaid reimbursement rates to reflect the loan as equity capital, must be affirmed.

We reach a different result as to the salary cost allowances. The Department disallowed certain of petitioner's salary costs pursuant to 10 NYCRR 86-2.25 (a) and 10 NYCRR former 86-2.11 (g), which capped salaries paid to relatives and total salaries paid to administrators, respectively.

Special Term, believing itself constrained by our decision in *Matter of Sigety v Axelrod* (107 AD2d 985), found that because neither of these regulations contained the salary ceilings in question, the ceilings, though apparently known to petitioner, were not properly promulgated as regulations and hence violated the filing requirement of NY Constitution, article IV, § 8. However, *Matter of Roman Catholic Diocese v New York State Dept. of Health* (66 NY2d 948) states that the filing requirements are triggered only when the provision involved is "a fixed, general principle to be applied by an administrative agency without regard to other facts and circumstances relevant to the regulatory scheme of the statute it administers" *(supra,* at 951). This court has recently had occasion to observe that a salary ceiling is not such a "fixed standard" that its publication as a regulation is an indispensable statutory or constitutional requirement *(Matter of Eden Park Health Servs. v Axelrod,* 114 AD2d 721, 723).

As to Shapins' salary, the Department's policy is to deliberately limit salaries of relatives to $8,500 so as to compel facility operators to make a showing that the salary paid equals that normally paid to nonrelated employees for the same services *(see,* 10 NYCRR 86-2.25). No factual substantiation of the reasonableness of the salary paid to Shapins having been made, the Department's application of the salary ceiling was proper. The same general reasoning convinces us that it would be inappropriate to disturb the manner in which the Department handled the salaries paid to petitioner's administrators.

We have considered the parties' other points and find them lacking sufficient substance to warrant comment.

Judgment modified, on the law, without costs, by reversing so much thereof as annulled the Department of Health's treatment of the salaries of petitioner's administrators and Nat Shapins, its purchasing agent, and directed respondents to recompute petitioner's 1982 and 1983 Medicaid reimbursement rates to reflect petitioner's actual costs for the aforementioned salaries; petition in this respect dismissed; and, as so modified, affirmed. Weiss, J. P., Mikoll, Yesawich, Jr., and Harvey, JJ., concur.